[No. 28709. *En Banc.* February 11, 1943.]

ANNIE CHAPPELL MONROE, *Respondent,* v. MARGARET E. WINN *et al., as Trustees, Appellants.*

VIETTA CHAPPELL ROBINSON *et al., Respondents,* v. MARGARET E. WINN *et al., as Trustees, Appellants.*[1]

[1]Reported in 133 P. (2d) 952.

*Kerr, McCord & Carey, Stephen V. Carey, Arthur E. Griffin,* and *Shorett, Shorett & Taylor,* for appellants.

*Jerome K. Kuykendall* and *Gail M. Williams,* for respondents Robinson *et al.*

*George Olson* and *George F. Hannan,* for respondent Monroe.

GRADY, J.—These consolidated actions were commenced by the beneficiaries of a trust created by the will of William Chappell, now deceased, against the trustees therein named and others, the principal relief sought being the removal of the trustees and the appointment of another or others; that an accounting be made by the trustees; and for general relief.

The court entered a decree removing the trustees and granting other relief, which, so far as necessary, will be referred to later in this opinion. The trustees have taken an appeal from the decree. The appeal of one of the trustees, Margaret E. Winn, formerly the wife of the decedent, cannot be considered for the reason that she has not filed any brief in this court in support of her appeal, and the motion for the dismissal of her appeal must be granted.

In his lifetime, William Chappell, a resident of Seattle, incorporated the Rainier Heat and Power Company as a domestic corporation. The corporation owned and operated a public utility plant and furnished heat, light, and power to a small area in Seattle. The legal title to the real estate involved here was vested in the corporation, and, for some time prior to the death of Mr. Chappell, the property was operated by the corporation. The capital stock of the corporation consisted of 15,000 shares, of which Mr. Chappell owned as his separate property 14,896 shares, Mrs. Chappell owned 100 shares, Arthur E. Griffin owned two shares, and another party owned the other two shares.

On December 22, 1920, William Chappell made a

will, by which he made a nominal bequest to a brother and a bequest to a son. The remainder of his property, he devised and bequeathed to his wife, Margaret E. Chappell, and Jesse F. Russell, and Arthur E. Griffin, and to the successor and successors of them, in trust for a period of sixty years from and after his death, with all the power and authority in the management of his estate of an absolute owner of the property in so far as the same should not be inconsistent with the directions contained in the will. The trustees were named as executrix and executors of the will, and it was in all respects a nonintervention will.

The pertinent parts of the will, so far as need be considered in this opinion, are as follows:

"FIRST: My said trustees shall manage my estate, collect and receive the income thereof, pay all taxes and assessments, insurance charges and all other charges and expenses incident to and arising out of the use, holding, control and management thereof, and out of repairs and renewals thereon and thereof.

"SECOND: Every month during the continuance of the trust period herein created, and whenever the net profits from my estate shall be sufficient to justify such payments after making estimates of and allowing for taxes, assessments, repairs and expenses to be paid and provided for in future, my said trustees shall pay to my mother, Angeline C. Chappell, a sum of money not less than Two Hundred ($200) Dollars per month; to my wife, Margaret E. Chappell, a sum not less than Eight Hundred ($800) Dollars per month; and to my sisters, Annie Chappell Monroe, Dora Chappell Robinson, Vietta Chappell Robinson and Lillie Chappell Wetherall, and to my brothers James B. Chappell, Charles Chappell and Marion J. Chappell a sum not less than Two Hundred ($200) Dollars each per month, provided that if at any time the net profits from my said estate shall not be sufficient to pay the amounts hereinbefore specified, then my said trustees shall pay to my said wife, mother, brothers and sisters named in this paragraph the amount of such net profits in the

same proportion to each as above specified. . . . and upon the death of my mother the payments hereby directed to be paid to her shall be divided equally between my living sisters and brothers named in paragraph Sub-division Two, and the legitimate issues of his, her or their bodies, each taking by representation. . . .

"THIRD: Whenever my trustees, herein named, or hereafter selected as herein provided, shall deem it to the best interests of my estate they are hereby authorized to set aside funds for buildings and permanent improvements and to build and permanently improve property belonging to my said estate, provided, however, that no funds shall be set aside for permanent improvements, or buildings when to do so would reduce the amount to be paid to my wife, my mother and my brothers and sisters herein named, as hereinbefore provided in the amounts specified.

"FOURTH: Whenever my trustees shall have a net income from my estate after providing for all taxes, assessments, repairs and expenses, which is more than sufficient to pay the amounts specified monthly to my beneficiaries herein named, or their descendants, and whenever they shall decide that it will not be to the best interests of my estate to improve the same or further improvements, then at such time or times they shall pay to my beneficiaries named in paragraph Two in the proportion to each therein provided, and in the event of the death of one or more of them, to the legal blood relations of my wife and the legal descendants of my mother, sisters or brothers as hereinbefore provided the full amount of such net income after making proper deductions for taxes, assessments, repairs and expenses.

"FIFTH: The trust hereby created shall continue and my said trustees herein named and their successors hereafter to be selected shall hold, manage, and control my property and the rents, issues, profits and renewals thereof as herein provided for a period of sixty years from and after the time of my death, . . .

"SIXTH: And it is my wish, will and desire that the said lots and blocks owned by the said Rainier

Heat and Power Company of which I am the owner of all but one hundred and four (104) shares of the capital stock, shall not be sold during the trust period, and I hereby direct that my trustees shall do everything in their power to prevent the sale or disposal of all of the said property now owned by the said corporation in said blocks above named, to the end that the said property in said blocks may be preserved by my said estate and improved as the net profits of my estate *just* justify and permit after the payment from the net income of my said estate as herein provided, and whenever it shall be deemed best and advisable for the best interests of my estate that said property in said blocks or any portion thereof should be permanently improved.

"SEVENTH: In the management of my estate my trustees shall have all the power and authority of an absolute owner of the property so far as the same shall not be inconsistent with the directions herein contained, and whenever it shall be deemed by them to be advisable or expedient, they may sell at public or private sale, for cash or on credit, and may mortgage, pledge and convey any and all portions of my estate except that they shall not sell or convey or authorize to be sold or conveyed any of the property now owned by me in said blocks Thirty-three (33), Thirty-four (34), Thirty-five (35), Forty-one (41), or Forty-seven (47), of Maynard's Plat of the Town (now City) of Seattle. And any moneys derived from any such sale they may use to pay any expenses or charges against my estate or which may be incurred in the management thereof, or in the erection of permanent improvements or buildings upon any of the portions of the property owned by me upon said blocks in Maynard's Plat, hereinbefore described."

In the selection of the trustees for a period of time which would cover more than their normal expectancy of life, Mr. Chappell chose those whom he had good reason to believe would be most interested in carrying out his wishes and the most competent to meet and work out the difficult economic, business, and legal

problems he evidently foresaw would arise. He chose his wife first. Next, he chose Jesse F. Russell. The acquaintance between Mr. Chappell and Mr. Russell commenced about 1911. A year later, Mr. Russell was employed by Mr. Chappell, managed properties for him, particularly those involved in this case, and was frequently consulted about general business affairs and policies. It is apparent that not only a very close friendship grew up between them over the years, but also a feeling of great confidence on the part of Mr. Chappell that Mr. Russell, in view of his mature age, ripened judgment, and intimate knowledge of all of the properties owned by the corporation, was one wholly competent to perform the duties the trust would impose. Then he chose Arthur E. Griffin, a former member of the superior court of this state and a lawyer of high standing. Mr. Chappell had been well acquainted with Judge Griffin for many years. Judge Griffin had been his attorney for a long period of time. There was a close personal relationship between them, and Mr. Chappell knew well the business and professional ability of Judge Griffin.

On May 31, 1921, Mr. Chappell died. The will was admitted to probate, and, in due time, the executors filed their final report and petition for distribution. On June 1, 1923, the court entered a decree allowing and approving the final report of the executors, and distributed the property of the estate to the trustees in trust for the uses and purposes as specified in the will of the decedent. Upon the entry of the decree of distribution, the trustees entered upon the execution of the trust. Although the property involved apparently belonged to the corporation, and the decedent's interest therein was represented by 14,896 shares of its capital total stock of 15,000 shares, all parties seemed to have regarded it as the property of the decedent, and none of the holders of the remaining

104 shares have asserted or claimed anything to the contrary. The trustees became directors of the corporation, and, to a great extent, if not entirely, operated and managed the property as though it belonged to the corporation but in accordance with the trust created by Mr. Chappell. However, for all practical purposes, this is immaterial.

In September, 1925, Mrs. Chappell remarried, and has ever since resided out of the state, and has not performed any substantial service in the execution of the trust. On a few intermittent occasions, she attended meetings of the directors of the corporation.

In this opinion, we shall hereinafter refer to the trustees Jesse F. Russell and Arthur E. Griffin as the appellants, to Mr. Chappell as the testator, to his former wife as Mrs. Winn, and to the plaintiffs as respondents.

When the appellants entered upon the performance of their duties, first as executors and later as trustees, the property, other than the power and heating plant, consisted of a number of buildings located in the southerly, and what might be termed the older, part of Seattle. The buildings had been rented to tenants and had been used for hotel and lodging house purposes, stores, and other income paying uses. Many of the buildings were old and in a run-down condition. The growth of business activity in Seattle was moving northward. The type and character of the tenants was changing, all with the corresponding diminution of rental values and income.

It at once became apparent to the appellants that, if the income from the property was going to be sufficient to pay the beneficiaries the amounts allotted to them, a farsighted program of improvements, repairs, and replacements would have to be inaugurated, and this they proceeded to do. It will serve no useful purpose to detail here all that the appellants did in carrying

out the program during the next eighteen years and until this action was brought, but they found it necessary to, and did, construct some new buildings to replace those that had served their usefulness. Some had to be removed because they had become fire hazards. Some of the property became so depreciated in value and so burdened with taxes that the appellants could no longer maintain it, and the property was sold for taxes. The appellants repurchased some of the property from King county for a substantially less amount than the taxes against it, but they did not consider the repurchase of any of the other property advisable from a business standpoint. In some areas, the tenants furnished a fruitful field of endeavor on the part of those charged with the enforcement of prohibition laws. The economic depression further complicated the situation. Throughout all this time, the appellants used their best efforts, and exercised what they deemed was their best and considered judgment, in carrying out the trust.

The value of the property when it came into the hands of the appellants was approximately $682,000, and some of it was burdened with encumbrances to the extent of more than $260,000. The appellants found it necessary to, and did, secure loans in order to repair and improve the property so as to keep it on an income basis, and gave mortgages to secure the indebtedness. When unable to secure necessary loans, one or more of them lent the appellants money and took mortgage security. In so far as the appellants encumbered any of the property to make improvements instead of using income or selling other property, it seems very clear this was an exercise of good business judgment so that there would be income for the beneficiaries and no sacrifice sales made. The value of the improvements made approximated the sum of $499,000. Between 1921 and 1940, the appellants made payments to the

beneficiaries in the sum of $458,415.30, the substantial amount of this being paid up to and including the year 1932. In subsequent years, the appellants derived a sufficient revenue from the property to pay but $7,814.92 to the beneficiaries. The total amount of cash from all sources handled by the appellants from June 1, 1921, to June 30, 1941, was $5,068,844.30.

When the appellants entered upon the execution of the trust, they found that the testator had made no express provision in his will for the payment of compensation to the trustees. A petition was filed in court praying that the court adjudge and determine that it was the intention of the testator that the trustees be paid reasonable compensation for their services, and that the same be fixed by the court. The court did not require any notice to be given of a hearing on this petition, but, by *ex parte* order, found that the testator intended that the trustees should be paid reasonable compensation each month and that such would be four hundred dollars for Mrs. Winn, four hundred dollars for Mr. Russell, and three hundred dollars for Judge Griffin. During the years 1923 to and including the first eleven months of 1940, Mrs. Winn received $59,500, Mr. Russell, $65,900, and Judge Griffin, $37,550. During this time, the record shows that Judge Griffin necessarily performed a large amount of legal services for the appellants separate from, and in addition to, his services as trustee, and received for legal services the total sum of $32,625.

The trial court entered a decree in the consolidated cases removing the trustees, awarding personal judgments against them, making the judgments against the appellants joint and several, and setting the same off against the mortgage indebtedness owing to them, appointing new trustees and an attorney to represent them, and allowing attorney's fees to the respondents, and costs and other minor relief.

At the close of the trial, the judge stated that, as to any intent on the part of appellants to secure funds or to misappropriate or embezzle them, there was no such thing shown in the case; that it was "as clean as a hound's tooth as to any deliberate intent to mulct the estate"; and that it was clean and free of even "the slightest intimation of extracting illegally." However, in subsequent memorandum decisions and by the decree, the trial judge concluded that the trustees, and each of them,

" . . . have not given to the trust that care, diligence, prudence and sound discretion which should apply to all transactions in connection with the said trust and have been guilty of mismanagement as more particularly outlined in the memorandum opinion of the court. . . . "

In his written opinions, he expressed the belief that the trustees should be removed because (a) they mismanaged the trust, in that they determined important questions of policy involving the expenditure of large sums of money and paid to themselves compensation and attorney's fees to Judge Griffin without an order of court; (b) they did not file accounts at regular intervals; (c) they never asked a court of equity to interpret the "trust agreement"; (d) they borrowed money and gave mortgages on the real estate, particularly in Maynard's plat, which, by the terms of the trust, they were not permitted to sell or convey; (e) they failed to pay taxes on certain of the real estate, and this property was lost by foreclosure proceedings; (f) that two of the trustees loaned money to the trust estate or to the corporation, and received mortgages to secure their loans; (g) that, instead of paying the mortgage indebtedness owing to the trustees promptly, they paid to the holders of them interest over a period of years; (h) they paid compensation to Mrs. Winn when she was absent from the state and not performing any

trust duties; and (i) they encumbered the corpus of the trust to make improvements which the will directed should be made out of the net income and from the sales of property.

The respondents have moved to dismiss the appeal of the appellants, but we think, in view of the nature of the trust and the kinds of duties required of the trustees, they have such an interest in the subject matter of the litigation as entitles them to appeal from the decree entered. The motion is denied.

When a trustee is chosen by a testator in his will, he has such powers as are conferred upon him by the terms of the trust and such powers as are necessary or appropriate to carry out the purpose of the trust and are not forbidden, it being assumed that the testator intended to grant to the trustee the authority to act in such a manner as the testator knew or anticipated would be necessary or appropriate to carry out the terms of the trust. The powers intended to be conferred must be gathered from the language of the instrument creating the trust and the nature and purpose of the trust. Where discretion is conferred upon a trustee with respect to carrying out the trust, the exercise thereof is not subject to control by the court except to prevent an abuse of such discretion. In administering the trust, the trustee must exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property and, in meeting this standard, the circumstances as they reasonably appear to him at the time of doing an act, and not at some subsequent time when his conduct is called in question, should be considered. The trustee owes to the beneficiaries of the trust the highest degree of good faith, diligence, fidelity, loyalty, and integrity, and the duty to deal fairly and justly with them and solely in their interests. The text books and the cases are so replete

with declarations of the foregoing rules that we deem citation of authority unnecessary.

We agree with the trial judge that the order of the court fixing the amount of compensation to be paid to the appellants was entered without jurisdiction. The fact that the testator made no express provision in his will for compensation for appellants does not take away their right to have paid to them a reasonable sum from time to time for their services. We do not think from the nature of the trust that the testator intended the services should be gratis. The appellants were interested parties. Their action in fixing their own fees and the fees for one of their number as attorney put them in a position adverse to the beneficiaries, and we think it was their duty to apply to the court to have the compensation fixed upon due notice to the beneficiaries.

We think the court erred in entering personal judgments against the appellants for excess compensation and attorney's fees. When consideration is given to the length of time over which the services were rendered and their nature and character, the excess beyond which the court found was reasonable is comparatively small. In the case of Judge Griffin, such excess would be about $2.75 a month. The appellants were also in error in paying any compensation to Mrs. Winn after she had left the state and ceased to take any active part in the administration of the trust. But this has been cured by the offsetting of the same against the indebtedness owing by the trust estate to her.

We disagree with the trial judge in his belief that the appellants should have invoked the jurisdiction of the court and secured its permission to make repairs to, improvements upon, and replacements of, the property of the trust estate and to have the court decide upon questions of policy or to interpret the terms

of the trust, which are plain and unambiguous. The powers conferred upon the appellants by the testator in his will creating the trust are very broad and comprehensive, and a wide discretion was given. The trust was a part of the nonintervention will, and it is apparent that the testator desired the exercise of the discretion and sound judgment of the experienced trustees in the management and operation of the trust property rather than the judgment of the court. A beneficiary of a trust has the right to appeal to the court and call in question actions of trustees which he may feel are not in his best interests, and the court has the power to intervene. But this jurisdiction must be exercised sparingly with reference to a trust of the kind we are now considering.

 It is our judgment, after examining the record in this case, the briefs of counsel and hearing their arguments, that the appellants, other than in the particulars referred to above, have administered the trust in accordance with its terms and have fully and faithfully performed their duties with respect thereto. There is no showing that any funds have been misappropriated or that the appellants have at any time acted in bad faith or with any dishonest motive. Although they have erred in some respects, yet their errors are not such as to have justified the court in ordering their removal from the further execution of the trust.

The decree as to Margaret E. Winn and the parts thereof allowing attorneys' fees for the attorneys for the respondents and for the accountant employed by them, is affirmed. That part of the decree removing appellants as trustees and appointing other trustees and an attorney for them is reversed. The respondents will recover their costs and disbursements in the lower court. Neither party will recover costs or disbursements in this court. The costs and disbursements, at-

torneys' fees, and fees of accountant shall be paid by the trustees out of the funds of the trust estate.

The case is remanded with directions to vacate the personal judgments against the appellants and for the entry of a decree in accordance with this opinion.

BEALS, STEINERT, BLAKE, ROBINSON, and MALLERY, JJ., concur.

MILLARD, J. (dissenting)—The fortune, which was his separate property, amassed by William Chappell, who died testate May 31, 1921, consisted principally of 14,896 shares of a total of 15,000 shares of the capital stock of Rainier Heat & Power Company, a domestic corporation, which owned a large amount of improved and unimproved real property in the Jackson street district in the city of Seattle.

After making two small cash bequests, the testator left the residue of his property in trust for a period of sixty years from the date of his death, naming his wife, Margaret E. Chappell (now Margaret E. Winn), Jesse F. Russell, and Arthur E. Griffin, trustees. The validity of the trust was unsuccessfully challenged by a son of the testator (*In re Chappell's Estate,* 124 Wash. 128, 213 Pac. 684 and 127 Wash. 638, 221 Pac. 336) and a decree was entered June 1, 1923, distributing the property to the trustees.

In October, 1940, Annie C. Monroe, one of the surviving sisters of the testator, instituted an action against the trustees, which was consolidated with another action which was instituted against the trustees by two surviving sisters and one surviving brother of the testator. Trial of the two actions, in which plaintiffs prayed for an accounting and removal of the trustees because of mismanagement of the trust, resulted in decree removing Arthur E. Griffin, Jesse F. Russell, and Margaret E. Winn as trustees because of their failure to give to the trust "that care, diligence, prudence and

sound discretion which should apply to all transactions in connection with the said trust." The court appointed substitute trustees, to whom the old trustees are directed to deliver the trust property. The new trustees are required, under the decree, to make a survey of the property of the trust estate to determine whether any of the properties should be sold and the proceeds reinvested. The decree further provides for reports by the new trustees and a hearing by the court when such reports are filed.

A personal judgment is awarded against Margaret E. Winn in an amount approximating $59,500, for the collection of which the judgment provides for cancellation of a mortgage which she holds on property of Rainier Heat & Power Company. A personal judgment is awarded against Jesse F. Russell in the sum of $5,850, and a judgment against Arthur E. Griffin in the sum of six hundred dollars, for payment of each of which judgments Russell and Griffin are made jointly and severally liable. The decree further provides that a certain note and mortgage given to Arthur E. Griffin by Rainier Heat & Power Company in the sum of three thousand dollars, together with accumulated unpaid interest, shall be canceled. The attorneys for the plaintiffs in one case were allowed a fee of four thousand dollars. The attorneys in the other case were awarded a fee of three thousand dollars, and a certified public accountant was allowed two hundred dollars. From that decree, in support of which the court did not make specific findings, the three trustees have appealed.

Margaret E. Winn has not filed a brief in this court. A brief is filed, as stated by their counsel,

" . . . on behalf of Arthur E. Griffin and Jesse F. Russell only who appeal from those portions of the decree removing them for alleged misconduct and giving the substitute trustees joint and several judgments against them for the amounts stated."

At the threshold of this appeal, we are met with respondents' motion for affirmance of the decree in so far as it affects appellant Margaret E. Winn because of her failure to file a brief in this court. The motion is granted under subd. 4, Rule XI of this court which provides that,

"If the appellant fail to file a brief, an affirmance will be directed." 193 Wash. 14-a.

The right of Arthur E. Griffin and Jesse F. Russell to appeal from that portion of the decree removing them as trustees is challenged by respondents' motion to dismiss their appeal for the reason that, as trustees, Griffin and Russell have no interest in the subject matter of the litigation (the trust estate); and, as an order removing a trustee is an incident only of the administration of the trust, it will not support an appeal.

Respondents concede the right of a trustee in his individual capacity to appeal from an order fixing his compensation or to appeal from a personal judgment against him for losses suffered by the estate during his administration, but insist that one who has no interest in a trust other than as trustee may not appeal from an order removing him as trustee.

Observing that the question presented is one of first impression in this court, counsel for respondents cite, in support of their position, claimed analogous authorities in which it was held that a person acting in a representative capacity only does not have the right of appeal from an order removing him from office.

In *Cairns v. Donahey*, 59 Wash. 130, 109 Pac. 334, we held that, where no order has been made in the cause which tends to impair or diminish the estate and no final order has been entered determining the matter of compensation, an administrator of an estate, appointed on the theory that the deceased died intestate,

has no such interest in the subject matter as to entitle him to appeal from an order revoking his letters and admitting a will to probate.

In *State ex rel. Casedy v. Inter-State Fisheries Co.,* 36 Wash. 80, 78 Pac. 202, we denied the right of a receiver to review an order discharging him. We said:

"We are of the opinion that no cause for issuing the writ is shown. No matter how much the receiver may feel aggrieved at the action of the court in removing him, he individually cannot complain. A party to the action has an interest in the personnel of the receiver, and it might be that, if the court should arbitrarily remove one and appoint another, he could have the orders reviewed in some way, but no such right belongs to the receiver. He may have orders relating to his compensation, his accounts, or his acts while receiver, reviewed, when he is aggrieved by such orders, but whether he personally shall or shall not continue as receiver is a question he has no right to litigate."

The foregoing was cited with approval in *State ex rel. Dunbar v. Superior Court,* 161 Wash. 550, 297 Pac. 774, which held that a court of equity was not deprived of power to appoint and remove receivers of insolvent savings and loan associations despite the statute which provided for liquidation of such associations by the director of efficiency as receiver.

In *Ex Parte Jonas,* 186 Ala. 567, 64 So. 960, it was held that, in the absence of statutory authority therefor, a receiver has no right of appeal from an order dismissing him as receiver. In meeting the argument that reasons for denial of the right of appeal to administrators and receivers were not applicable in the case of a trustee, in view of the fact that the receiver or administrator is a creature of the court's creation while the trustee is appointed by the instrument of the trust, the supreme court of Alabama said:

"When an estate is being administered by the chancery court through a receiver, there is no difficulty in

determining what constitutes the equities of the cause, the substantial merits thereof. The receiver may be discharged by the court and a successor appointed; and it is conceded, there being no statutory provision therefor, that from such a discharge no appeal would lie. *Pagett v. Brooks,* 140 Ala. 257, 37 South. 263. He is but an officer of the court, and his discharge can in no manner affect any of the substantial merits of the cause. The analogy to the case in hand is, in our opinion, complete. The only argument advanced to demonstrate a difference is that the trustee received his appointment by deed, and the receiver his, from the court. The distinction is more in theory than in reality. True, the trustee was named in the deed but when he accepted the trust it was with a recognition of the law that the administration of the trust estate is subject to the jurisdiction of the chancery court, and, when that jurisdiction is rightfully assumed, that the trust is to be administered through the court, and not through the trustee except as an instrument of the court. True, as is argued, the trustee is interested by way of compensation, and so also is a receiver; but this is a mere incident in the administration of the trust estate, and in no manner affects any of the substantial merits of the cause. It is not a property right in the trust estate, but is an incident to the office he holds as trustee or receiver, for services rendered."

In a later consideration of *Ex Parte Jonas, supra,* the supreme court of Alabama in *Pake v. Leinkauf Banking Co.,* 186 Ala. 307, 65 So. 139, adhered to its holding and said:

"A majority of the members of this court, however, were and are of the opinion, for the reasons declared in the above case, that, when a trust estate for the benefit of creditors is being administered in the chancery court under the provisions of our statutes, an order removing the trustee is a mere incident to the administration of the trust, in no way concerns any of the substantial merits or equities of the cause, and is therefore not such a final decree as will support an appeal."

Counsel for respondents also cite 4 C. J. S. 309, reading as follows:

"In the absence of special statutory provision to the contrary, an order or decree appointing, refusing to appoint, removing, or refusing to remove, a receiver is generally held not to be appealable, either on the ground that it is merely interlocutory, or because it is discretionary; and the same is true of an order removing, or refusing to remove, a trustee or assignee for the creditors; but, if the order or decree determines rights and is a final one, an appeal will lie."

Counsel for respondents cite 2 Am. Jur. 961 and *Pedroli v. Scott,* 44 Nev. 258, 193 Pac. 852, in support of the rule that, after an executor or administrator is discharged, his right of appeal no longer exists, and that, in order to support appeal in his individual capacity, he must show that he is a *party aggrieved.* Our attention is directed to *Lynch v. O'Brien,* 13 Wn. (2d) 581, 126 P. (2d) 47, in which we held that an executor named in an earlier will is not authorized to contest a later will in which another is named executor, as the former is not a "person interested" within the meaning of the statute (Rem. Rev. Stat., § 1385 [P. C. § 10017]) authorizing any *person interested* in any will to contest the validity of such will within a stipulated period.

Citing, as illustrative of cases in which an administrator or executor is aggrieved and may appeal in his individual capacity, those cases fixing his compensation and settling his accounts, counsel for respondents argue:

"But the question of who shall administer the trust is a question to be determined by a court of equity in the interests of those who are in ultimate fact the owners of the trust estate. The only interest that the trustee has in the future administration is in his right to future compensation. Since no beneficiary joined him in the appeal and since a court of equity has exercised

its inherent jurisdiction to administer the trust, his right to future compensation entitles him to no greater right of appeal than a receiver. For certainly no person holding a position of trust can be heard in court to assert that the emoluments that may come from his continuance in the execution of the trust, constitute a personal interest against the interest of those otherwise concerned in the trust. Like a receiver, executor or administrator this will not support his right to appeal. *Ex Parte Jonas,* 64 So. 960; *McFarland v. Pierce,* 47 N. E. 1."

Obviously, it is the ultimate purpose of respondents to obtain a termination of the trust as created by the testator in order that they may have all or a portion of the corpus of the estate distributed to them instead of income only as provided by the will. To achieve that objective, respondent beneficiaries made the testamentary trustees parties defendant, which was prerequisite to litigation of the matter.

In *State ex rel. Race v. Cranney,* 30 Wash. 594, 71 Pac. 50, we held that, if a party has sufficient interest to make him a party to an action, he has sufficient interest to appeal should the judgment be against him. In *In re Bayer's Estate,* 108 Wash. 565, 185 Pac. 606, we held that the guardian of an insane person has such a representative interest as to be an "aggrieved" party, entitled, within the meaning of the statute (Rem. Rev. Stat., § 1716 [P. C. § 7290]), to appeal from an order discharging him from his trust as guardian. In *National Ass'n v. Grassley,* 159 Wash. 185, 292 Pac. 416, we held that an assignee of an assigned claim has an appealable interest. We stated that, if the assignee obtained sufficient legal title to become the real party in interest for the purpose of prosecuting the action, he also has sufficient title to prosecute the appeal; that it would be illogical to hold otherwise.

In *In re MacNair,* 163 Wash. 508, 2 P. (2d) 82, we held that officers of the United States veterans' bureau

have an interest in the estate of a ward sufficient to support an appeal.

In *Knettle v. Knettle,* 164 Wash. 468, 3 P. (2d) 133, we held that the trustee of a spendthrift trust created by deed may appeal although the beneficiary whose interest is sought to be reached has not appealed. We said:

"We have not overlooked the fact that the defendant Ernest W. Knettle has not appealed from the decree, but we are, nevertheless, of the opinion that the trustees have, by reason of their active duties imposed upon them by the trust deed, such interest in this controversy as to entitle them to the reversal of the decree to the extent claimed by them."

In *Fowler v. Lanpher,* 193 Wash. 308, 75 P. (2d) 132, the beneficiaries of a testamentary trust sought to have the trust terminated. We held that such a trust is indestructible after the death of the settlor, and being an active one it cannot be terminated without the consent of the trustee for the reason that the trustee is the representative of the testator, charged with the solemn duty of seeing to it that the trust is executed as the testator intended.

The applicable rule is that one, who acts in a representative capacity by which he is charged with the duty to protect an estate committed to his charge in the interest of all concerned, has such an interest as entitles him to appeal. 2 Am. Jur. 960; *Thompson v. Weimer,* 1 Wn. (2d) 145, 95 P. (2d) 772; *Fletcher v. Los Angeles Trust and Savings Bank,* 182 Cal. 177, 187 Pac. 425.

The estate left by William Chappell was his separate property which he saw fit to leave in trust for a period of sixty years. Initially, the testator's beneficiaries were his mother, his widow, and certain brothers and sisters, none of whom was given any interest except certain stated portions of income during the trust period. Who may be the ultimate beneficiaries of the

trust cannot be known until the trust terminates approximately forty years from the present time. In the meantime, there is no one to represent the testator and charged with the duty of seeing to it that his will is executed as he made it other than the trustees whom he selected for that very purpose.

The two actions which resulted in the decree from which this appeal was taken were instituted by less than all of the beneficiaries avowedly to destroy the trust created by the testator; that is, these beneficiaries are endeavoring to obtain a termination of the trust, have the property sold, and the proceeds distributed to them to the exclusion of their descendants who will become entitled to the corpus when the time arrives for distribution of the estate. It is probable, taking into consideration the age of each, that none of the present surviving brothers and sisters will be alive when the estate is ripe for distribution two score years from the present time. It also appears that minors, who are prospective beneficiaries, have not been made parties by guardian *ad litem* or otherwise.

It is the duty of the trustees appointed by the will to represent the testator, the present beneficiaries other than the respondents, and the prospective beneficiaries who may be born before the expiration of the trust period. Patently, if the trustees appointed by the will to conserve the estate may be removed without sufficient cause and the right to appeal denied, then a spendthrift trust (the trust in the case at bar has some of the characteristics of a spendthrift trust) would be good only for such length of time as the spendthrift beneficiaries were willing to restrain themselves from squandering the corpus as well as the current income. Of course, a court of equity may, because of, and to prevent further, maladministration by a testamentary trustee, remove such trustee, but no trial court has the

unlimited power to destroy the trust as created by the testator or substantially to impair it.

In holding, in *Lynch v. O'Brien,* 13 Wn. (2d) 581, 126 P. (2d) 47, that the executor of an earlier will did not have the right to contest the validity of a later will, we pointed out the difference between an executor and a testamentary trustee and said:

"In each of these cases, however, the court concluded that a trustee named in the earlier will could prosecute a contest. The basic reason for making the distinction seems to be that a testamentary trustee has a more substantial interest than an executor under an earlier will; that the trustee is clothed with title, and, in the language of *Reed v. Home Nat. Bank, supra,* 'In fact a trustee is a legatee, and he takes legal title as such.' "

By the will of Mr. Chappell, the trustees were vested with title to the entire estate. Under the decree, which removed them from office and divested them of title to the trust estate, the testamentary trustees clearly have an interest in the trust estate sufficient to constitute them aggrieved parties within the provisions of the appeal statute. (Rem. Rev. Stat., § 1716.)

In assigning error on removal of trustees Griffin and Russell, on award of recovery aggregating $6,450 against Griffin and Russell, and on allowance of attorney's fees of $7,000 to respondents' attorneys, appellants challenge sufficiency of the evidence to sustain charges, summarized as follows, made by respondents against the trustees:

The trustees paid to Margaret E. Winn $59,500 for services, which she never rendered, as trustee.

The trustees took compensation, the amounts of which were either paid under a void order of the superior court or were allowed to themselves by the trustees without any authority therefor.

The trustees incurred liabilities on behalf of the trustees for large amounts of unnecessary interest paid and accrued to themselves.

The trustees permitted valuable property to be forfeited for nonpayment of taxes.

The trustees failed to file proper accounts.

The trustees, without authority therefor, borrowed money on security of the trust property for use in making permanent improvements.

The trustees deviated from the terms of the trust instrument by encumbering the corpus of the trust estate to make improvements which the will directed should be made out of net income and from the sale of specific property.

The estate of William Chappell at the time of his death was appraised at approximately $680,000 of which in excess of $600,000 was represented by the shares of stock of Rainier Heat & Power Company. The will provided that the three trustees (Griffin, Russell, and Winn) should manage the estate of the testator, collect and receive the income thereof, and, after payment of all charges and expenses incident to the control and management of the business, they were directed to distribute to certain designated beneficiaries sums of money as follows:

"SECOND: Every month during the continuance of the trust period herein created, and whenever the net profits from my estate shall be sufficient to justify such payments after making estimates of and allowing for taxes, assessments, repairs and expenses to be paid and provided for in future, my said trustees shall pay to my mother, Angeline C. Chappell, a sum of money not less than Two Hundred ($200) Dollars per month; to my wife, Margaret E. Chappell, a sum not less than Eight Hundred ($800) Dollars per month; and to my sisters, Annie Chappell Monroe, Dora Chappell Robinson, Vietta Chappell Robinson and Lillie Chappell Wetherall, and to my brothers James B. Chappell,

Charles Chappell and Marion J. Chappell a sum not less than Two Hundred ($200) dollars each per month; provided that if at any time the net profits from my said estate shall not be sufficient to pay the amounts hereinbefore specified, then my said trustees shall pay to my said wife, mother, brothers and sisters named in this paragraph the amount of such net profits in the same proportion to each as above specified."

The testator in the following language provided for permanent improvements of the trust property:

"THIRD: Whenever my trustees, herein named, or hereafter selected as herein provided, shall deem it to the best interests of my estate they are hereby authorized to set aside funds for buildings and permanent improvements and to build and permanently improve property belonging to my said estate, provided, however, that no funds shall be set aside for permanent improvements, or buildings when to do so would reduce the amount to be paid to my wife, my mother and my brothers and sisters herein named, as hereinbefore provided in the amounts specified.

"FOURTH: Whenever my trustees shall have a net income from my estate after providing for all taxes, assessments, repairs and expenses, which is more than sufficient to pay the amounts specified monthly to my beneficiaries herein named, or their descendants, and whenever they shall decide that it will not be to the best interests of my estate to improve the same or further improvements, then at such time or times they shall pay to my beneficiaries named in paragraph Two in the proportion to each therein provided, and in the event of the death of one or more of them, to the legal blood relation of my wife and the legal descendants of my mother, sisters or brothers as hereinbefore provided the full amount of such net income after making proper deductions for taxes, assessments, repairs and expenses."

The trust was to continue for a period of sixty years, at the expiration of which time the corpus of the estate was to be distributed to named beneficiaries.

While the testator gave to his trustees all the power and authority of an absolute owner of the property, he qualified that statement with the provision that the trustees were to be vested with all the power of an absolute owner so far as the same was not inconsistent with the directions contained in the will. The trustees were granted the power to sell at public or private sale, for cash or on credit (and were also authorized to pledge and convey), any and all portions of the trust estate, except that they were not authorized to sell or convey, or authorize to be sold or conveyed, any of the property owned by the testator in blocks 33, 34, 35, 41, and 47 of Maynard's plat of the city of Seattle. The pertinent portions of the will read as follows:

"And it is my wish, will and desire that the said lots and blocks owned by the said Rainier Heat and Power Company of which I am the owner of all but one hundred and four (104) shares of the capital stock, shall not be sold during the trust period, and I hereby direct that my trustees shall do everything in their power to prevent the sale or disposal of all of the said property now owned by the said corporation in said blocks above named, to the end that the said property in said blocks may be preserved by my said estate and improved as the net profits of my estate *just* justify and permit after the payment from the net income of my said estate as herein provided, and whenever it shall be deemed best and advisable for the best interests of my estate that said property in said blocks or any portion thereof should be permanently improved.

"SEVENTH: In the management of my estate my trustees shall have all the power and authority of an absolute owner of the property so far as the same shall not be inconsistent with the directions herein contained, and whenever it shall be deemed by them to be advisable or expedient, they may sell at public or private sale, for cash or on credit, and may mortgage, pledge and convey any and all portions of my estate except that they shall not sell or convey or authorize

to be sold or conveyed any of the property now owned by me in said blocks Thirty-three (33), Thirty-four (34), Thirty-five (35), Forty-One (41), or Forty-seven (47), of Maynard's Plat of the Town (now city) of Seattle. Any moneys derived from any such sale they may use to pay any expenses or charges against my estate or which may be incurred in the management thereof, or in the erection of permanent improvements or buildings upon any of the portions of the property owned by me upon said blocks in Maynard's Plat, hereinbefore described."

In the event of disabling sickness of one of the trustees or in the event of his or her absence from this state, the testator provided that all powers necessary for the care and preservation of his estate "may be exercised by any two of the trustees during the sickness, or absence from the state of Washington of the other trustee."

There was an absence from the will of any provision for compensation of the trustees. Within the month in which the decree was entered distributing the estate to the trustees, an order, on petition of the trustees therefor, was entered by the probate court fixing the future amounts of the compensation of the trustees. Mrs. Winn was allowed four hundred dollars monthly as compensation as trustee, the same amount was allowed to appellant Russell as trustee, and three hundred dollars monthly was allowed to appellant Griffin, as trustee, which allowance was to be in addition to any amount paid to him for his services as attorney. That order also provided that the trustees were authorized to pay to themselves the amount stated each month beginning June 30, 1923, until further order of the court. That was an *ex parte* proceeding without notice to any beneficiary of, or other persons interested in, the trust.

The trustees paid to themselves for the remainder of the year 1923 and subsequent years salaries which were reduced in varying amounts. Those payments were as follows:

| | M. E. Winn Salary | A. E. Griffin Salary | A. E. Griffin Legal Services | J. F. Russell Salary |
|---|---|---|---|---|
| 1923 | $2800.00 | $2100.00 | $1575.00 | $2800.00 |
| 1924 | 4400.00 | 3300.00 | 2700.00 | 4400.00 |
| 1925 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1926 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1927 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1928 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1929 | 4800.00 | ·3600.00 | 2700.00 | 4800.00 |
| 1930 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1931 | 4800.00 | 3600.00 | 2700.00 | 4800.00 |
| 1932 | 4050.00 | 1700.00 | 2475.00 | 4050.00 |
| 1933 | 2850.00 | ...... | 1950.00 | 3300.00 |
| 1934 | 2400.00 | ...... | 1800.00 | 3000.00 |
| 1935 | 2400.00 | ...... | 1800.00 | 3000.00 |
| 1936 | 2400.00 | 1800.00 | ...:... | 3000.00 |
| 1937 | 2400.00 | 1800.00 | ...... | 3000.00 |
| 1938 | 2200.00 | 1650.00 | 75.00 | 2875.00 |
| | | | 525.00 | 1500.00 |
| 1940 11 Mo. | | | 825.00 | 1375.00 |
| | $59,500.00 | $37,550.00 | $32,625.00 | $65,900.00 |

In addition to the foregoing, the law firm of Griffin & Griffin received $5,000 August 17, 1923, account of legal services for probate and will contest. November 23, 1923, that law firm received $15,000 as payment in full account of such legal services. November 14, 1923, A. E. Griffin received $5,000, account of executor's fees, and November 23, 1923, he received $10,000 as payment in full account of executor's fees. In September and November, 1923, fees in the amount of $15,000 were paid to Margaret E. Winn for services as executrix.

J. F. Russell was paid during 1923, $15,000 for services rendered as executor.

The trustees made payments as follows to the several beneficiaries of the trust:

| | | |
|---|---|---|
| To Angeline Chappell, mother of the trustor, now deceased, | 1921-1929 | $ 27,300.00 |
| To Margaret E. Winn, widow of the trustor, | 1921-1938 | 152,805.00 |
| To Annie C. Monroe, sister of the trustor, | 1921-1938 | 39,758.61 |
| To Dora C. Robinson, sister of the trustor, now deceased | 1921-1931 | 34,042.90 |
| To Mabel V. Head, daughter of Dora C. Robinson, deceased | 1931-1938 | 952.63 |
| To Beatrice Talbot, daughter of Dora C. Robinson, deceased | 1931-1938 | 952.63 |
| To Bertha Jeffries, daughter of Dora C. Robinson, deceased | 1931-1938 | 952.62 |
| To Florence Grant, daughter of Dora C. Robinson, deceased | 1931-1938 | 952.62 |
| To James Albert Robinson, son of Dora C. Robinson, deceased | 1931-1938 | 952.63 |
| To Katherine Franz, daughter of Dora C. Robinson, deceased | 1931-1938 | 952.62 |
| To Vietta C. Robinson (Reeves), sister of the trustor, | 1921-1938 | 39,758.61 |
| To Lillie C. Wetherell, sister of the trustor, | 1921-1938 | 39,758.61 |
| To James B. Chappell, brother of the trustor, now deceased, | 1921-1929 | 27,190.00 |
| To Gladys Grupp, daughter of James B. Chappell, deceased | 1929-1938 | 6,284.30 |
| To William E. Chappell, son of James B. Chappell, deceased | 1929-1938 | 6,284.30 |
| To Charles Chappell, brother of the trustor, | 1921-1938 | 37,930.01 |
| To Beatrice Chappell, as guardian of Charles Chappell, | 1931-1932 | 1,828.59 |
| To Marion Chappell, brother of the trustor, now deceased, | 1921-1926 | 15,700.00 |
| To Anna Chappell, as guardian of Marion Chappell, Jr., son of Marion Chappell, deceased, | 1926-1938 | 23,861.62 |
| To Marion Chappell, Jr., son of Marion Chappell, deceased, | 1938 | 197.00 |
| TOTAL DISBURSEMENTS TO BENEFICIARIES | 1921-1938 | $458,415.30 |

In 1925, Mrs. Chappell remarried—her name is now Mrs. Winn—discontinued her residence within this state, but the trustees continued to pay to her a salary for services, which she never rendered as trustee of the estate.

Of the total of $458,415.30 paid to the beneficiaries,

an aggregate of $450,600.38 was paid prior to 1933. It will be noted from the following statement of amounts distributed to the beneficiaries from June 1, 1921, to December 31, 1940, that subsequent to 1932 the beneficiaries received a total of $7,814.92 for the years 1933, 1937, and 1938 and did not receive anything during the other years after 1932:

| | |
|---|---|
| 1921 | $ 16,800.00 |
| 1922 | 31,200.00 |
| 1923 | 36,000.00 |
| 1924 | 36,000.00 |
| 1925 | 43,200.00 |
| 1926 | 44,158.00 |
| 1927 | 43,442.00 |
| 1928 | 44,400.00 |
| 1929 | 44,400.00 |
| 1930 | 44,400.20 |
| 1931 | 44,400.22 |
| 1932 | 22,199.94 |
| 1933 | 1,199.92 |
| 1934 | ........ |
| 1935 | ........ |
| 1936 | ........ |
| 1937 | 3,150.00 |
| 1938 | 3,465.00 |
| 1939 | ........ |
| 1940 | ........ |
| TOTAL | $458,415.30 |

When the estate was distributed to the trustees, the second half of the 1920 taxes against the trust property, in the amount of $19,336.40, was unpaid, in addition to which improvement assessments in the amount of $36,570.30 against the property were unpaid. A note payable to the Seattle-First National Bank in the amount of $40,000, secured by a general collateral pledge of the assets of the trust estate, was outstanding. There were against the trust property the following mortgages:

| | |
|---|---|
| Metropolitan Life Insurance Company | $ 68,750.00 |
| United States Mortgage & Trust Company | 30,000.00 |
| Mary E. Shorey | 1,750.00 |
| San Francisco Savings & Loan | 60,000.00 |
| Total | $160,500.00 |

When this cause came on for trial, there were the following encumbrances or charges against the trust estate:

| | | |
|---|---:|---:|
| Tax Agreements, King County | | $ 9,841.27 |
| Accrued Interest Payable: | | |
| Margaret E. Winn mortgage | 12,754.74 | |
| Arthur E. Griffin Note | 357.42 | 13,112.16 |
| Mortgages: | | |
| Seattle-First Nat'l Bk. covering property known as the Bush Hotel situated on Lots 7 and 8, Block 41 of D. S. Maynard's Plat | 33,483.79 | |
| Washington Mutual Sav. Bk. covering the Publix Hotel, situated on Lots 1 and 2, Block 35, D. S. Maynard's Plat; and Depot Garage, situated on Lots 3 and 4, Block 35, the same Plat and the Governor Apartment Hotel on Lots 5 and 6, Block 33, Maynard's Plat; (the original mortgage on this property was made in 1928 for $170,000.00) | 96,720.11 | |
| Reconstruction Finance Corporation Mortgage Company, Lots 5 to 8, Block 34 and Lots 1 and 2, Block 31, Maynard's Plat | 40,749.13 | |
| Margaret E. Winn, covering property known as the Rainier Heat & Power Company office building, on Lots 3 and 4, Block 47, Maynard's Plat | 45,126.68 | |
| A. E. Griffin | 3,000.00 | $219,079.71 |
| 1941 taxes—bills not yet available, estimated | | 18,000.00 |
| Total lien encumbrances | | $260,033.14 |

The following pieces of trust property on January 1, 1939, were lost to King county for taxes:

Lots 3 and 4, block 41, Maynard's plat, (Dreamland hotel).
Lots 14, 15, 19 to 24 inclusive, block 22, Hill Tract addition.
Lots 6, 7, 8, block 23, Hill Tract addition.
Lots 15 and 16, block 25, Hill Tract addition.
Lots 14 to 16 inclusive, block 16, Hill Tract supplemental addition.
Lots 10 to 14, inclusive, block 27, Hill Tract supplemental addition.
Lot 5, block 4, Terry's fourth addition.
Lots 3 and 4, block 40, Maynard's plat.

The taxes on the above-described tracts of property were delinquent since 1931, and the forfeiture occurred

in 1939. During that period, Rainier Heat & Power Company, which owned the property, collected the rental earned on the property but did not pay the taxes due thereon. The first tract—Dreamland hotel property—was reacquired from the county by the heating corporation in the fall of 1939. When the property was forfeited, the accumulated taxes amounted to $8,424.93. The price paid on its repurchase from the county was $6,030 or approximately $2,400 less than the amount of taxes against the property. The annual tax charge against the property was $1,100. Under its contract of repurchase the heating corporation pays personal property taxes on the equity on the repurchase contract which amounts to $495.00 annually. The property earns about $200 monthly. To the repurchase price of $6,030 should be added the loss of rentals during the eight months' period King county received the rentals from the property.

The tax claim against lots 14, 15, and 16, block 16, Hill Tract supplemental addition amounted to $1,257. After the forfeiture of that property to it, King county sold lot 16 for $1,200 and subsequently sold lots 14 and 15 for $1,225. This property was partially improved. However, the buildings thereon were very old and the rental therefrom amounted to twenty dollars monthly, which the trustees deemed insufficient to pay the upkeep on the buildings. It appears that the price received by the county for lot 16 was almost enough to pay the whole amount of taxes due on the three lots, from which, it is argued by the respondents, had the trustees been diligent the purchase price of lots 14 and 15 would have gone to the benefit of the trust estate.

The taxes against lots 10 to 14, inclusive, block 27, Hill Tract supplemental addition, amounted to $1,126. King county sold lots 12 to 14, inclusive, in 1941 for $1,500, which is in excess of the amount of taxes

against the property and the county still has lots 10 and 11 for sale. This, respondents argue, manifested a lack of diligence on the part of the trustees. Appellants explain that the property never produced any income; that it is on a dead corner surrounded by tax title property, and, while the trustees were aware that the sale would be made of lots 12, 13, and 14, they did not have a representative at the sale as the heating corporation was not interested in the property.

Lots 19 to 24, inclusive, block 22, Hill Tract addition, was sold by King county in the spring of 1941 for $1,200. The taxes against these lots amounted to $761.30. This is cited by respondents as another specific example of lack of diligence on the part of trustees who could have sold the property themselves and realized in excess of $400 for the estate. Appellants argue that the property was nonproductive and would not justify expenditures for improvements.

Lots 6, 7, and 8, block 23, and lots 15 and 16, block 25, Hill Tract addition, it clearly appears, were forfeited because there was no way in which the lots mentioned could be made to produce a net income. Likewise, lot 5, block 5, Terry's fourth addition was nonproductive.

Lots 3 and 4, block 40, Maynard's plat, against which tract, after 1931, there were taxes in the amount of $4,400, are still owned by King county. That property has been vacant since 1935 when an old frame building, which was uninhabitable, was wrecked. The ground is twelve to fourteen feet below grade and after 1931 the property was deemed by the trustees to be a liability instead of an asset.

The properties forfeited for taxes were carried on the books of the heating corporation as having originally cost $136,850 and having an assessed value of $73,458. The taxes which the corporation would have

been required to pay to retain the properties amounted to $14,066.

Respondents insist that it was the duty of the trustees, before permitting the properties to be lost and before allowing, contrary to the express terms of the will, the Maynard's plat property to be sold, to either advise the beneficiaries or ascertain by petition to a court of equity whether they were authorized to proceed as they did; that, by their breach of that duty, the trustees lost a part of the Maynard's plat property, lost several other properties, and took a chance of losing another portion of Maynard's plat property; and that some of the properties were subsequently sold by the county at prices which would have realized for the trust estate, instead of the county, a not insignificant sum of money.

After receiving the trust property the trustees elected Margaret E. Winn, Arthur E. Griffin, Jesse F. Russell, and Walter E. Thumler as directors of Rainier Heat & Power Company. The personnel of that board of directors has not since changed. Although Mrs. Winn removed from this state after her remarriage in September, 1925, she has continued to serve as president of the corporation, Arthur E. Griffin as secretary, Jesse F. Russell as treasurer, and Walter E. Thumler as vice-president and manager. Thumler, who is a nephew of Mrs. Winn, has been the active manager of the heating and power company during the existence of the trust.

A trustee's duty to his trust is defined as follows in *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place.

Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. *Wendt v. Fischer,* 243 N. Y. 439, 444, [154 N. E. 303]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

Mindful of the foregoing and in the sound exercise of a discretion which inheres in a court of equity, the trial court removed the trustees for conduct inconsistent with their duty as trustees. The trial court made no findings of fact—none was necessary as this is an equity case—but it is clear from an examination of the record before us that the trustees were removed because of the failure of the trustees to give to the trust estate the prudent management and fidelity which the law and sound morals require of those bound by fiduciary ties.

The trustees participated in the payment to Mrs. Winn of $59,500 for fees for her services as trustee when, in fact, she did not render any services. The fact that Mrs. Winn has abandoned her appeal does not absolve appellants Griffin and Russell.

Mrs. Winn, who was formerly the wife of William Chappell, remarried in September, 1925, and ceased to be a legal resident of this state. Subsequent to her remarriage, she did not render any services to the trust estate as trustee; nevertheless she was paid for her so-called services $59,500, which the trial court correctly required her to return to the estate. Subsequent to September, 1925, Mrs. Winn attended six meetings of the board of directors of the heat and power company, made not more than eight trips to Seattle from her

home in California and engaged in personal correspondence—one to four letters monthly—with her nephew, Walter E. Thumler, who is manager of the heat and power company. Appellants Griffin and Russell were of the opinion that Mrs. Winn's services, above described, were worth $59,500 to the trust estate. That displays a lack of judgment which justifies their removal as trustees. In this regard alone they failed to give to the trust estate the prudent management demanded of them by virtue of the fiduciary ties by which they were bound.

The payment of $59,500 to Mrs. Winn cannot, nor can payment of compensation to Griffin and Russell, be justified on the basis of the order, entered January 21, 1923, by the probate court fixing the amounts of compensation in the future for services not yet rendered by the trustees. The *ex parte* order entered on petition of the trustees by the probate court fixing the amounts of their future compensation, is absolutely void for lack of jurisdiction in the court to make such an order *ex parte* and without notice. *In re Peterson's Estate,* 12 Wn. (2d) 686, 123 P. (2d) 733.

When the trustees were called in the case at bar to account for their stewardship, and their right to compensation under the above-mentioned *ex parte* order was challenged, the trustees claimed they were entitled under the evidence to compensation in excess of the amount they received under the void *ex parte* order. The position of the trustees is not logical. They failed to disregard the void order for eighteen years, but, when they became unsuccessful parties defendant in an action calling them to acount, they endeavored to disregard that void order.

If the trustees were not paying themselves in accordance with the void *ex parte* order on which they do not now rely, they paid compensation to themselves

on what they conceived their services were worth during the period of eighteen years; that is, the trustees performed services, passed on the adequacy of their own services, and then determined what they should pay themselves for their own services. Each trustee was his own employer, employee, and paymaster.

It should be borne in mind that funds disbursed were trust funds and that courts are jealous of the rights of *cestuis que trustents;* therefore, trustees will not be permitted to pass on the adequacy and value of their services to the trust estate. On the one hand, the trustees were proceeding under a void order. On the other hand, they had dual roles of employers and employees in which they determined the adequacy of their own services and the amount to pay themselves for such services. No attempt was ever made to obtain the approval of a court of equity and no beneficiary was ever afforded an opportunity to be heard until the beneficiaries brought this action against the trustees. Clearly, the three trustees are guilty of the grossest abuse of the duty which they owed as trustees to their fiduciaries.

"By the common law rule, a trustee is supposed to give his services gratis and is not entitled to compensation. *Warbass v. Armstrong,* 10 N. J. Eq. 263. Nowadays, either by the terms of the trust agreement, or by statute, compensation is usually given him. But unless it be so specified by the agreement, or by statute, a trustee cannot legally fix the amount of his own allowance or pay himself out of the trust estate until so directed by the court." *In re Locarno Building & Loan Ass'n,* 127 N. J. Eq. 509, 13 A. (2d) 791.

Even if it were conceded that unauthorized payments of compensation to Griffin and Russell and other acts alleged to constitute mismanagement of the trust estate were not detrimental, financially, to the estate, therefore, as no loss resulted to the estate, the trustees

should not be removed because of those acts, the payment of $59,500 to Mrs. Winn for services which she never rendered resulted in a loss to the estate; a loss which probably would not have been discovered and the amount returned to the estate if this action had not been instituted. Those cases cited by counsel for appellants to the effect that, where no loss to the estate results from the alleged mismanagement of the estate by the trustees, such alleged mismanagment is not a sufficient ground for removal of the trustees are, obviously, inapposite.

Another specification of misconduct, as a result of which the estate became liable for thousands of dollars of unnecesary interest, is that Mrs. Winn and appellant Griffin loaned their own funds to the trust estate and failed to repay the money so advanced when repayment was not only possible but prudent.

The law is that a trustee is under a duty to the beneficiary to administer the trust solely in the interest of such beneficiary and, in doing this, an undivided loyalty to the trust is required. The trustee is not permitted to make a profit out of the trust. True, a trustee may, where the circumstances are necessitous and the trust instrument authorizes such encumbrances, lend his own funds to the trust estate and encumber the property of the estate to secure payment of such loan; however, the trustee must, at the earliest possible time, repay such loan as a trustee may not be permitted to use the trust estate for his own investments.

"The first complaint is the rejection of the claim of the trustee for interest on the sum of $800 necessarily placed by him in his trust account on December 27, 1924, in order to pay taxes due on some of the trust property. The advance has never been paid, and the trustee claims interest from December 27, 1924. Its disallowance was right. The trustee can-

not make the trust an opportunity for the investment of his private funds, and his failure to repay himself at the opportunity early afforded deprives him of any equity to interest." *Nichols v. McGill,* 178 Atl. 697, 704.

See, also, *Purdy v. Johnson,* 174 Cal. 521, 163 Pac. 893; and *Meinhard v. Salmon,* 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1.

We summarize as follows the trustees' explanation concerning the mortgage appellant Griffin has against the trust property:

In 1932, the heating corporation owed to the Seattle city light department $6,000, payment of which the city demanded on penalty of shutting off the power if the bill was not paid. If payment had not been made, numerous tenants of the heating corporation, which is trust property, would have been forced out of business. Griffin advanced $1,000 from his personal funds to pay on the $6,000 due to the city light department. In 1938, when taxes had become delinquent on a great deal of the heating corporation's property and a loan from the Reconstruction Finance Corporation was insufficient to pay all of the taxes on the property, which the trustees thought should be retained, Griffin advanced an additional $2,000. To secure payment of this loan he took a mortgage on lots 33, 34, 35, and 36, block 17, Hill Tract, which was property, the trustees insist, which would have been forfeited to the county if Griffin had not made the loan of $2,000. The mortgage covers the $2,000 advanced to pay taxes and the $1,000 advanced in 1932 to pay on the power bill.

At the time of trial, there was an outstanding mortgage by the heating corporation to Mrs. Winn. Appellants' explanation respecting that mortgage is as follows:

The mortgage was given August 23, 1923, when Mrs. Winn advanced from her own funds $35,000 to make payment on a $65,000 mortgage held by an insurance company, which mortgage was on the corporate property prior to Mr. Chappell's death. In 1925, two payments aggregating $15,000 were made on the mortgage. August 1, 1927, a balance of $20,000 was due to Mrs. Winn who exchanged the mortgage for an unsecured note. In October, 1927, she advanced $10,000 which was used for construction of permanent improvements and a portion of that loan was used to pay on an indebtedness of the estate to a local bank. In November, 1929, Mrs. Winn advanced $10,000 to the estate which was used to pay two notes held by appellant Griffin, one dated December 4, 1923, and one dated October 1, 1925, each in the amount of $5,000, representing funds advanced by appellant Griffin for purposes of the heating corporation. In March, 1934, the heating corporation executed a mortgage to Mrs. Winn in the amount of $45,126.68 which represents the $40,000 advanced by Mrs. Winn plus $5,126.68 accumulated interest. In October, 1938, the unpaid and delinquent interest had accumulated on this mortgage in the sum of $12,754.74.

One of the exhibits in this cause, reading as follows, discloses that, from 1923 to 1932, the trustees paid $18,042.09 to Mrs. Winn as interest on the estate's obligation of $40,000 to her:

RAINIER HEAT AND POWER CO.
MORTGAGE PAYABLE—MARGARET E. (CHAPPELL) WINN
December 31. 1940

Previous to March 14, 1934, advances by M. E. Winn were evidenced by mortgages and notes of various amounts. On that date, the note indebtedness amounted to................... $40,000.00
to which was added unpaid accrued interest of........ 5,126.68

and a new note (secured by mortgage) given for...... $45,126.68

INTEREST PAID AND ACCRUED—1923 to Dec. 31, 1940

INTEREST PAID OR ACCRUED TO MARCH 14, 1934

1923 – interest paid
at 6% on $35,000.00........ $2,100.00

1924 – interest paid
at 6% on 45,000.00........ 2,451.00

1925 – interest paid
at 6% on 20,000.00 to
35,000.00........ 1,839.16

1926 – interest paid
at 6% on 20,000.00........ 1,200.00

1927 – interest paid
at 6% on 20,000.00........ 1,200.00

1928 – interest paid
at 6% on 30,000.00........ 1,800.00

1929 – interest paid
at 6% on 30,000.00........ 1,800.00

1930 – interest paid
at 6% on 40,000.00........ 2,400.00

1931 – interest paid
at 6% on 40,000.00........ 2,656.67

1932 – interest paid on account
on $40,000.00........ 595.00

TOTAL INTEREST PAID TO 12-31-32..$18,042.09

1934 – Unpaid interest accrued to
3/14/34 and added to and
made a part of Mortgage
Note .................... 5,126.68

TOTAL INTEREST PAID OR ACCRUED
TO MARCH 31, 1934......................... $23,168.77

INTEREST ACCRUED AND UNPAID ON
MORTGAGE OF $45,126.68 UP TO NOVEMBER, 30, 1938

1934 – interest at 6% – 3/15 to 12/31 2,149.99
1935 – " " " – 1 year ...... 2,707.60
1936 – " " " " " ...... 2,707.60
1937 – " " " " " ...... 2,707.60
1938 – " " " – 1/1 to 11/30. 2,481.95

TOTAL INTEREST ACCRUED AND
UNPAID ON MORTGAGE....................... 12,754.74

INTEREST PAID ON MORTGAGE PLUS ACCRUED INTEREST
The following interest has been paid on
mortgages beginning in December 1938.
The interest has been computed on the
mortgage of $45,126.68 plus unpaid accrued interest to 12/31/37 of $10,272.79
or on a total of $55,399.47

1938 – December ................... 277.00
1939 – 12 months ................... 3,324.00
1940 – 12 months ................... 3,324.00

INTEREST PAID ON MORTGAGE AND
ACCRUED INTEREST OF $55,399.47.............. 6,925.00

TOTAL INTEREST PAID OR ACCRUED –
1923 TO DEC. 31, 1940...................... 42,848.51

LESS – interest added to Mortgage Note.. 5,126.00
interest paid – 1923 to Dec. 31, 1940 24,967.09

30,093.77

INTEREST UNPAID DECEMBER 31, 1940...........$ 12,754.74

It will be seen from the foregoing that March 14, 1934, the accrued and unpaid interest amounted to $5,126.68, which was added to the original indebtedness and a mortgage given to Mrs. Winn covering property in Maynard's plat. The trust estate became obligated to pay interest on the $5,126.68 item of unpaid interest. From the date of the mortgage to November 30, 1938, unpaid interest accrued in the amount of $12,754.74. In December, 1938, the trustees resumed interest payments to Mrs. Winn, and, from December, 1938, up to and including the year 1940, Mrs. Winn was paid from the trust estate $6,925.00 in interest charges. In other words, since 1923 Mrs. Winn has received from the trust estate $30,093.77 in interest payments and there is now owing to her interest in the amount of $12,-754.74. On an obligation of $40,000 Mrs. Winn has been credited with a total of $42,848.51 in interest charges.

It was not necessary to pay all of this interest. Manifestly, the trustees were guilty of gross mismanagement of the estate. The will provided for minimum payments, aggregating $28,800 per annum, to the beneficiaries. The minimum amount payable subsequent to 1929 by reason of the death of the testator's mother, was $26,400 per annum. In the early portion of this opinion is an itemized statement of amounts distributed to the beneficiaries from 1921 to and including 1940, from which it appears that, from 1923 to 1929, inclusive, the minimum requirements of the will demanded payment of $201,600, but during that period the trustees paid $291,600.02, or $90,000 in excess of the amounts required by the will to be paid to the beneficiaries. For

the years 1930 to 1932, inclusive, the beneficiaries were paid a total of $111,000 or a payment of $31,800 in excess of the minimum requirements under the will.

From 1923 to 1932, inclusive, the trustees paid to the beneficiaries $121,800 in excess of the amounts required to be paid under the will. During the same period of time, the trustees paid to Mrs. Winn approximately $40,000 as compensation for services as trustee when, in fact, she had performed no services. During these same years the trustees realized in excess of $40,000 from the sale of properties, but nothing was paid on Mrs. Winn's mortgage; in fact, the trustees incurred an obligation in excess of $40,000 for interest on Mrs. Winn's mortgage up to the time of trial of this cause.

If in June, 1932, the power company, which is an asset of the trust estate, could not pay to the city of Seattle the power bill of $6,000, which it is urged by the trustees had to be paid to continue the existence of the company as a going concern, it is not understandable where the trust estate found funds with which to pay the following items: Twenty-two thousand dollars to the beneficiaries; salary of $4,050 to Mrs. Winn as compensation for her services, which she never rendered, as trustee; seventeen hundred dollars to appellant Griffin, as trustee's salary; two thousand, four hundred and seventy-five dollars to appellant Griffin for legal services; four thousand fifty dollars to appellant Russell for services as trustee.

It is not conceivable that a court would have allowed $12,275 as compensation to the trustees in addition to a salary for a manager of the heat and power company in the year that the trust was not able to pay its power bill.

We are convinced by our examination of the record that the estate was able to pay the Winn mortgage in full. The failure to pay that mortgage and the incurring of interest charges in excess of $40,000 because

of the failure of the trustees to pay that mortgage, together with the borrowing of money from appellant Griffin damaged the trust estate, and, obviously, constituted mismanagement, which warranted the trial court's removal of the trustees. To hold otherwise would be to lower "the level of conduct for fiduciaries." *Meinhard v. Salmon, supra.*

We find no justification for payment by the trustees of the items of interest. The argument of appellants that, if the decree against Mrs. Winn is correct, the trust estate has not been damaged, is without merit. In other words, if we follow counsel for appellants, the trust estate was not prejudiced, even if the trustees paid improper interest charges, because the beneficiaries brought an action and recovered the amount of the interest charges.

Plainly, if this action had not been instituted the trustees would probably have continued the interest payments for another eighteen years. There is nothing in the record to indicate that the trustees had any intention of paying the mortgage for some time. Since 1932, the beneficiaries have received a total of only $7,814.92. It was, indeed, time that an action be commenced to require the trustees to give an account of their stewardship.

Counsel for respondents insist that the appellant trustees mortgaged property of the trust estate contrary to the expressed provision of the will and without the sanction of a court of equity and without notice to the beneficiaries. It is argued that the sixth paragraph of the will, quoted above, provides that property in the Maynard plat shall not be sold during the trust period, which property shall be preserved and improved as the net profits of the estate justify and permit, after the payment from the net income of the estate as provided in the will. Counsel for respondents particularly stress paragraph seven of the will which vests in the trustees

the power and authority of an owner in fee except as such power is inconsistent with the directions of the will. That paragraph expressly authorizes the trustees to sell at public or private sale and to mortgage and convey all portions of the estate whenever they deem advisable except "that they shall not sell or convey, or authorize to be sold or conveyed any of the property owned by" Chappell in blocks 33, 34, 35, 41, and 47 of Maynard's plat.

The outstanding mortgages on the property described are listed above. Each of the mortgages was placed by the trustees on the property, after the death of Chappell, without the sanction of a court of equity and without notice to the beneficiaries.

Respondents insist that, by mortgaging the property, the trustees assumed risk of its loss and in the event of default the property would be subject to "sale or disposal" and the power of the trust estate to control "sale or disposal" would be gone which is the very thing prohibited by the testator in his will. It is argued that, in order that there might not be any confusion in the interpretation of his clear and unequivocal language, after giving a general power of sale to the trustees, the testator clearly provided in the seventh paragraph of his will that the trustees should not sell or convey or authorize to be sold or conveyed any of the testator's property in Maynard plat; that the testator by providing against the sale or disposal of the property forbade mortgaging of that property. If, in the administration of the trust, emergent demands presented a situation necessitating a deviation from the terms of the trust instrument in order to preserve the trust estate as a whole, it would be the duty of the trustees to invoke the jurisdiction of an equity court and notify the beneficiaries before the deviation was made. As the property of the trust estate was the property of the beneficiaries, no deviation from the

terms of the trust should be permitted unless the beneficiaries, as owners of the property, are afforded an opportunity to be heard in connection with the deviation.

"Where the trustee makes a mistake of law as to the extent of his duties or powers as trustee, it is no defense that he relied upon the advice of an attorney, even though the attorney was competent or the trustee reasonably believed that he was competent. It is immaterial whether the mistake is as to a statutory or common-law rule of law or as to the interpretation of the trust instrument. The extent of the duties and powers of a trustee is determined by the rules of law which are applicable to the situation, and not the rules which the trustee or his attorney believes to be applicable; and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney. The subjection of the trustee to liability where he is not at fault in making the mistake may seem harsh. He can, however, escape liability by submitting the matter to the court for its instructions. If he is in doubt as to his duties or powers, he can thus avoid the risk of acting on his own opinion or on that of his attorney." 2 Scott on Trusts, § 201, p. 1086.

In holding that a deviation from powers granted trustees in a trust instrument should not be permitted until after hearing to which beneficiaries of the trust are adequately represented, the United States district court for the southern district of New York, in *Moss Tie Co. v. Wabash R. Co.*, 11 F. Supp. 277, 285, said:

"The extent to which a trustee has a right to act in connection with trust property shades like a spectrum from the instances wherein he is expressly given by the trust instrument itself the power which he is asked to exercise, through cases in which such a right may be implicit in varying degrees by a proper interpretation of the trust instrument, down to cases in which it is perfectly obvious that, for the benefit of the trust estate, the trustee must have instructions to act entirely

outside of any authority conferred on him by the trust instrument and thus to deviate from it.

"In every respect wherein the equity court is asked to exercise such powers as are here invoked, the situation should be treated as one in which it is possible that, on an examination of the pleadings and documents involved and after hearing evidence if necessary, the court will order a departure from the trust instrument.

"Therefore, I do not think there is any proper basis as some of the cases seem to suggest for a differentiation between the representation of cestuis que trustent necessary in proceedings where it is sought merely to interpret the powers given to a trustee by the trust instrument and cases in which the trustee is obviously being asked to deviate from it. There should be as full a representation of the cestuis que trustent on the record in respect of one kind of suit as in respect of the other."

Since they commenced administration of the trust, the trustees have mortgaged the properties in question for more than $300,000, and the trustees not once sought authority from a court of equity to mortgage the property. In no instance was any beneficiary afforded the right to be heard.

Counsel for appellants concede the rule invoked by counsel for respondents that the fact that a trust instrument confers a power of sale upon a trustee does not confer upon such trustee a power to mortgage the property but counter that, under the trust instrument, the trustees had authority to mortgage the property; that it was not necessary for them to obtain authority from the court to borrow money, payment of which was secured by mortgages against the property in question for the purpose of making permanent and profitable improvements.

Whether there was an unauthorized deviation by the trustees from the terms of the trust instrument and whether any of the improvements, as a matter of good business management, were justified, we need not de-

termine. By reason of the interest payments to Mrs. Winn and appellant Griffin and payment of unearned compensation to Mrs. Winn, the estate sustained losses which the trustees are unable to justify. Such mismanagement alone warranted removal of the trustees.

There is no merit in appellants' contention that the trustees are entitled to compensation in addition to the amount they took from the estate under a void order or exacted from the estate for eighteen years without any authority therefor.

The challenge of appellants to allowance of attorney's fees of $7,000 to respondents' counsel is likewise without merit. The benefits from this action to the estate amply support the allowance made.

The foregoing was written by the undersigned following assignment of the cause to him June 16, 1942, for opinion. I am still convinced of the correctness of the opinion.

There was an absence from the will of any provision for compensation of the trustees. Judge Griffin and his cotrustees were aware of the necessity for judicial allowance of compensation as is evidenced by their petition therefor in January, 1923. Those trustees were not ignorant of the rule that an order, *ex parte* and without notice, fixing their compensation was void. They now admit they know the law, but urge that they are entitled to reasonable compensation for services rendered to the estate and are not relying upon the void order. That is, with knowledge that the order was void they, nevertheless, paid to themselves compensation thereunder for eighteen years, but now that they are called to account they seek to disregard the void order and recover on *quantum meruit* for the services rendered. In other words, the appellants concede that knowingly they paid to themselves under a void order compensation as trustees for a period of eighteen years,

but that now they are entitled to the value of their services during the period of their stewardship.

It is a rule which needs no citation of sustaining authority and, on principle, is applicable to the situation presented in the case at bar, that one who performs services under a contract void as in contravention of a statute—e. g., one-year statute of frauds under which a contract of employment with a corporation is unenforcible—may recover for the work actually performed on *quantum meruit,* and the value of the services is measured by that fixed in the contract. The trustees, by the void order they obtained, established the *value* of their services to the estate. That the trustees have been amply compensated is clear from an examination of the record. See pages 459 to 461, in which payments to lawyers, trustees, and beneficiaries are itemized.

The rule, to which some courts are committed, that deduction by trustees of compensation before allowance of same will not subject the trustees to liability for interest on the compensation withdrawn, is subject to the qualification that it must be shown that the trustees actually earned the compensation when they took it, that they acted in good faith, and that no injury to the estate resulted. If the trustees acted in good faith in obtaining knowingly an invalid order fixing their fees, they are not entitled to more than the value of their services, which value was fixed by the trustees in their petition and the void order which they should not now be permitted to disregard. That injury resulted to the estate by reason of the trustees' misconduct cannot be gainsaid. The payment of $59,500 to Mrs. Winn for services she never rendered cannot seriously be urged as beneficial to the estate. The payment of thousands of dollars of unnecessary interest on loans (see pages 469-474) from Mrs. Winn and appel-

lant Griffin was not beneficial to the estate. The loss of $59,500 paid to Mrs. Winn (which the majority excuses because now recouped) would probably have not been discovered and the amount returned to this estate if this action had not been instituted.

It is indeed paradoxical to allow fees to the attorneys for respondents and to reverse this judgment. Such allowance admits misconduct of the trustees and resultant loss to the estate. The only warrant for compensation to attorneys for respondents is the benefit derived by the estate from the action instituted by those attorneys in which action the misconduct of the trustees and the loss to the estate were disclosed.

The judgment should be affirmed in its entirety.

SIMPSON, C. J., and JEFFERS, J., concur in the result reached by MILLARD, J.

[1]Reported in 133 P. (2d) 974.